IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TROY DANIELS, | ) | CASE NO.  3:19-cv-02946 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Troy Daniels ("Plaintiff" or "Daniels") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his applications for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 14.

For the reasons explained herein, the Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

On October 31, 2017, Daniels protectively filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").[1]  Tr. 11, 169, 170, 288-293, 294-

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 11/24/2020).

297.  Daniels alleged a disability onset date of July 15, 2017.  Tr. 11, 288, 294.  He alleged

disability due to bipolar disorder, Crohn's disease, sleep apnea with daily CPAP use, and Franc's

fracture in the foot.  Tr. 18, 130, 172, 209, 225, 317.

After initial denial by the state agency (Tr. 209-222) and denial upon reconsideration (Tr.

225-236), Daniels requested a hearing (Tr. 237-238).  A hearing was held before an

Administrative Law Judge ("ALJ") on February 21, 2019.  Tr. 34-64.  On April 8, 2019, the ALJ

issued an unfavorable decision (Tr. 8-33), finding that Daniels had not been under a disability, as

defined in the Social Security Act, from July 15, 2017, through the date of the decision (Tr. 12,

28).  Daniels requested review of the ALJ's decision by the Appeals Council.  Tr. 286-287.  On

November 5, 2019, the Appeals Council denied Daniels' request for review, making the ALJ's

decision the final decision of the Commissioner.  Tr. 1-7.

## II. Evidence[2]

### A.    Personal, vocational and educational evidence

Daniels was born in 1973.  Tr. 39, 314.  Daniels has a GED.  Tr. 39, 318.  At the time of

the hearing, Daniels was married and living with his wife, two children, and his sister-in-law.

Tr. 38-39.  Daniels worked in the past as an operator in a factory assembling parts for washing

machines and dryers.  Tr. 40.  He last worked at that job in October 2018.  Tr. 40.  He had tried

to return to work to support his family but it did not work out.  Tr. 40-41. Daniels was also

employed in other assembly jobs and worked in residential construction.  Tr. 41-44.

### B.    Medical evidence

#### 1.    Treatment history

---

[2] Daniels' appeal relates to the ALJ's evaluation of his alleged psychological impairments.  *See* Doc. 15, p. 3.  Thus, the evidence summarized herein is generally limited to evidence relating to those impairments.

On April 18, 2016, Daniels saw Richard Tobey, M.D., to establish a primary care relationship.  Tr. 563-566.  Daniels reported injuring his left knee while working at home.  Tr. 563.  He was treated at the emergency room for the injury the prior week.  Tr. 563.  Daniels also wanted to discuss medications he had been on in the past for other conditions, including GERD and ADD.  Tr. 563.  Daniels relayed that he had ADD since childhood and he had tried multiple medications for it.  Tr. 563.  He was interested in restarting medication for his ADD.  Tr. 563.  On examination, Dr. Tobey observed that Daniels was alert and cooperative and he had a normal mood, affect, attention span and concentration.  Tr. 564.  Dr. Tobey's impression included ADHD and depression/anxiety and he referred Daniels to psychiatry for those issues.  Tr. 565.

Daniels saw Dr. Tobey the following month on May 18, 2016.  Tr. 567-569.  Daniels relayed that four to five years earlier he had tried various medications for bipolar disorder.  Tr. 567.  Daniels noted adverse side effects from some of those medications and indicated he was interested in trying Latuda.  Tr. 567.  On examination, Dr. Tobey observed that Daniels was alert and cooperative and he had a normal mood, affect, attention span and concentration.  Tr. 567.  Dr. Tobey ordered prescriptions for Latuda, noting that Daniels had already tried two other atypical antipsychotics for bipolar disorder.  Tr. 568-570.  Dr. Tobey also noted that they were still in the process of trying to get Daniels connected with psychiatry if other efforts failed.  Tr. 569.

When Daniels saw Dr. Tobey on July 21, 2016, Daniels was taking Gedeon for his mental health conditions.  Tr. 573, 575.  Daniels reported that he liked to get out and do things, stating "if he misses a do[se] he can feel [it][.]"  Tr. 573.  Dr. Tobey's impression was that Daniels' depression/anxiety was stable.  Tr. 574.

Daniels saw Dr. Tobey on December 15, 2016, for a follow-up visit.  Tr. 595-597. Daniels reported that his mood was stable on Gedeon.  Tr. 595.  On examination, Dr. Tobey observed that Daniels was alert and cooperative and he had a normal mood, affect, attention span and concentration.  Tr. 596.

During a February 15, 2017, visit with Dr. Tobey, Daniels reported having low energy and drinking a lot of caffeine to do things.  Tr. 598.  On examination, Dr. Tobey observed that Daniels was alert and cooperative and he had a normal mood, affect, attention span and concentration.  Tr. 598.  Dr. Tobey added new problems, including bipolar disorder II, most recent episode major depressive with melancholic features.  Tr. 600.  A PHQ-9 Depression Assessment was conducted.  Tr. 600-601.  Daniels' score was an 8 which corresponded to mild or minimal depressive symptoms and mild depression severity.  Tr. 601.

On March 17, 2017, Daniels saw Dr. Tobey for follow up after having undergone a sleep study.  Tr. 627.  Daniels requested a refill of Gedeon.  Tr. 627.  On examination, Dr. Tobey observed that Daniels was alert and cooperative and he had a normal mood, affect, attention span and concentration.  Tr. 628.  Dr. Tobey refilled Daniels' Gedeon.  Tr. 629.

When Daniels saw Dr. Tobey for follow up on June 27, 2017, Daniels indicated that a different physician had prescribed Klonopin.[3]  Tr. 658.  On examination, Dr. Tobey observed that Daniels was alert and cooperative and he had a normal mood, affect, attention span and concentration.  Tr. 658.  During a July 27, 2017, visit, Dr. Tobey again observed that Daniels was alert and cooperative and he had a normal mood, affect, attention span and concentration. Tr. 684-685.  Daniels' complaints during that visit related to his physical impairments.  Tr. 684.

During a September 19, 2017, visit with Dr. Tobey, Daniels was still smoking –

---

[3] It appears that the Klonopin was prescribed by a physician who had been evaluating Daniels' sleep-related issues. Tr. 658, Doc. 15, p. 6.

he had tried Chantix but stopped because it was causing suicidal thoughts.  Tr. 702.  Daniels reported depression – he had no cash, was not working and he was sleeping a lot.  Tr. 702.  Dr. Tobey recommended that Daniels restart Gedeon, stop Chantix, add Cymbalta, and try Amitriptyline at bedtime.  Tr. 702, 704.  On examination, Dr. Tobey observed that Daniels' mood was euthymic.  Tr. 703.   During an October 30, 2017, visit Dr. Tobey observed that Daniels' mood was euthymic.  Tr. 696.

Daniels had an assessment at Firelands Counseling ("Firelands) on November 12, 2018.[4] Tr. 886-892.  Daniels had referred himself for counseling to address his symptoms associated with his PTSD and bipolar disorder.  Tr. 886.  Daniels' wife was present with him for the assessment.  Tr. 886.  Daniels reported the following symptoms – nightmares, flashbacks, feelings of hypervigilance (sometimes feeling "out of body"), bouts of depression, feelings of helplessness and hopelessness, lack of motivation, sadness (lasting a couple of weeks at a time), manic episodes (not sleeping for days, having high energy, and feeling very motivated to do a lot of things).  Tr. 886.  Daniels relayed that he had recently gone through a manic episode that led to him being arrested and losing his job – after losing control at work and being sent home, Daniels ranted on Facebook, which alarmed the police and led to him being arrested and served with a TPO.  Tr. 886.  Daniels was diagnosed with bipolar disorder I, most recent episode manic, severe; and PTSD.  Tr. 891-892.  He was referred for individual counseling.  Tr. 890.

Daniels returned to Firelands for individual counseling on December 6, 2018.  Tr. 893. Daniels reported concerns regarding mood regulation.  Tr. 893.  On metal status assessment, Daniels' affect was euthymic; he was oriented to person, place, time and circumstance; and he was cooperative.  Tr. 893.

---

[4] Firelands Counseling conducted a prescreen in October 2018.  Tr. 884-885.

Daniels did not show for a December 12, 2018, appointment at Firelands.  Tr. 894-895.

During a December 21, 2018, counseling session, Daniels relayed that he was continuing with

starting a business.  Tr. 896.  He reported that the breathing exercises he had learned were

helping – he was not "losing it" like he had before.  Tr. 896.  On metal status assessment,

Daniels' affect was euthymic; he was oriented to person, place, time and circumstance; and he

was cooperative.  Tr. 896.  The counselor noted "slight" progress.  Tr. 896.  Daniels did not show

for a December 26, 2018, appointment at Firelands.  Tr. 897.

During a January 3, 2019, counseling session, Daniels relayed that he was having some

issues with the positive imagery technique without vocal assistance from his therapist but he had

not had any issues with his wife since practicing the techniques he had learned.  Tr. 898.  Daniels

reported he was considering a career change.  Tr. 898.  The counselor assisted Daniels with

completing a pros and cons chart.  Tr. 898.  The counselor noted that Daniels might benefit from

a "med evaluation" but was still on the wait list.  Tr. 898.  On mental status assessment, Daniels'

affect was euthymic; he was oriented to person, place, time and circumstance; and he was

cooperative.  Tr. 898.  The counselor noted "slight" progress.  Tr. 898.  Daniels did not show for

appointments at Firelands on January 18, 2019, and February 27, 2019.  Tr. 899, 901-902.

### 2.  Opinion evidence

#### a.  Treating source

On September 26, 2017, Daniels' treating physician Dr. Tobey completed a Medical

Source Statement (Mental).  Tr. 541-543.  Dr. Tobey indicated that he treated Daniels for "basic

medical and [right] foot [fracture[.]"  Tr. 541.  Dr. Tobey did not list any mental health

diagnoses.  Tr. 541.  He opined that, if Daniels was in a full-time employment setting, Daniels

would not decompensate or have increased psychological symptoms.  Tr. 541.  Dr. Tobey opined

that Daniels would be off task 60% of the workday but also found that Daniels had no limitations in various mental functional abilities. Tr. 542-543.

On December 14, 2017, Dr. Tobey sent a "To whom it may concern" letter in response to a request for records regarding Daniels' disability claim. Tr. 560. With respect to Daniels' bipolar disorder, in the December 15, 2017, letter, Dr. Tobey stated "Patient is on medication for this and controlled last I knew. If he feels that his symptoms are not controlled, we can discuss medication changes and connect him to psychiatry if needed." Tr. 560.

### b. Consultative examiner

On January 22, 2018, clinical psychologist Wayne Morse, Ph.D., saw Daniels and conducted a consultative psychological evaluation. Tr. 720-725. Dr. Morse opined that Daniels' symptoms suggested the following diagnoses: bipolar I disorder, most recent episode depressed, severe (principal diagnosis); PTSD; unspecified dissociative disorder; alcohol use disorder, severe, in early remission; and cannabis use disorder, mild. Tr. 723-724.

Dr. Morse offered his opinions regarding Daniels' functional abilities and limitations. Tr. 724. In the area of understanding, carrying out, and remembering instructions, both one-step and complex, Dr. Morse opined that "[t]he evidence suggested that [Daniels] is able to understand, remember, and carry out multi-step workplace instructions." Tr. 724.

In the area of sustaining concentration and persisting in work-related activities at a reasonable pace, Dr. Morse opined that "[t]he evidence suggested that he is able to concentrate and persist in work-related activity." Tr. 724.

In the area of social interaction, Dr. Morse indicated that Daniels "was depressed but had no difficulty interacting with" Dr. Morse. Tr. 724. Dr. Morse noted that "[t]here were examples of [Daniels'] difficulty in interpersonal relationships interfering with his ability to work[.]" Tr.

724.  Dr. Morse opined that "[t]he evidence suggested that [Daniels] is unable to respond appropriately to supervisors, coworkers, and the public in a work setting."  Tr. 724.

In the area of dealing with normal pressures in a competitive work setting, Dr. Morse noted that Daniels had reported an inability to work for medical reasons and because of difficulty with interpersonal relationships and concentration.  Tr. 724.  Dr. Morse noted that, on two occasions, Daniels' mental health symptoms had interfered with his ability to work.  Tr. 724.  Also, Dr. Morse noted that Daniels' had several court ordered counseling sessions that he described as negative; Daniels was taking psychotropic medication that alleviated his symptoms; and Daniels reported two psychiatric hospitalizations he had as an adolescent, which he described as negative because he felt he was being punished.  Tr. 724-725.  Dr. Morse opined that "[t]he evidence suggested that [Daniels] is unable to respond appropriately to normal pressures in a work setting."  Tr. 725.

### c.  State agency reviewers

On February 2, 2018, state agency reviewing psychologist Jaime Lai, Psy.D., completed a psychiatric review technique ("PRT") (Tr. 139-140) and a mental RFC assessment (Tr. 144-146).  In the PRT, Dr. Lai opined that Daniels had no limitations in his ability to understand, remember or apply information or in his ability to concentrate, persist or maintain pace; and moderate limitations in his ability to interact with others and in his ability to adapt or manage oneself.  Tr. 140.

In the mental RFC assessment, Dr. Lai explained that Daniels retained the ability to: understand, remember and carry out multi-step workplace instructions and perform multi-step tasks with adequate pace, persistence, and concentration under ordinary levels of supervision.  Tr. 144-145.  Dr. Lai further explained that Daniels' ability to deal with supervisors, coworkers

and the public would be reduced and he would be limited to brief, superficial interactions in non-public work settings.  Tr. 145.  Also, Dr. Lai explained that Daniels' ability to handle stress and pressure in the workplace would be reduced but adequate to handle tasks without strict time limitations or production standards.  Tr. 145.

Upon reconsideration, on March 15, 2018, state agency reviewing psychologist Courtney Zeune, Psy.D., completed a PRT (Tr. 176-178) and mental RFC assessment (Tr. 182-183).  Dr. Zeune findings affirmed Dr. Lai's findings.

**C.     Testimonial evidence**

**1.      Plaintiff's testimony**

Daniels was represented and testified at the hearing.  Tr. 37, 38-55.  When asked what kept him from working full-time, he stated: problems with his foot, stomach problems, and PTSD, which makes it hard for him to be around people sometimes in a work environment.  Tr. 46-47.

Daniels has difficulty sleeping at night.  Tr. 50.  He can take care of his personal hygiene and cook.  Tr. 50.  Daniels is able to perform household chores but he loses focus so it takes him a while to complete the chores.  Tr. 50-51.  Daniels enjoys watching professional football and playing with cars with his five-year old son.  Tr. 51.  He used to enjoy building model cars and houses but he no longer has the ability to focus to finish them.  Tr. 51-52.  Daniels tries to attend church every week.  Tr. 52.

Daniels explained that his problems with completing tasks are related to his bipolar disorder and attention deficit problem.  Tr. 52.  He has racing thoughts.  Tr. 52.  The medication that Daniels had been taking for his bipolar disorder and personality disassociation was working well.  Tr. 52-53.  However, Daniels has still had some problems controlling his temper.  Tr. 53.

Daniels does not have problems being around friends or meeting new people in a small group environment.  Tr. 53.  However, he had been experiencing some problems being around a lot of people, e.g., when in a mall or large retail store.  Tr. 53.  Daniels did not get along well with supervisors.  Tr. 54.  He does not like being told what to do.  Tr. 54.  In working with his counselor, his counselor thinks that Daniels' problems with authority figures started with his dad and being in prison at age 18 and the PTSD resulting from that.  Tr. 54.

Daniels has had a panic attack a couple times which he described as sweating and shaking and feeling like he was having a heart attack.  Tr. 54-55.  He also indicated he has anxiety attacks a couple times each month.  Tr. 55.  Although Daniels does not have crying spells, there are times that he sits and feels like he should be crying - he feels sad and depressed but tries not to cry because his grandfather said he should not cry.  Tr. 55.

### 2. Vocational expert's testimony

A Vocational Expert ("VE") testified at the hearing.  Tr. 55-63.  The VE described Daniels' past work as: construction worker, an SVP 4,[5] heavy job; machine operator II, an SVP 3, medium job; and production assembler, an SVP 2, light job.  Tr. 56-57.

The ALJ then asked the VE to consider a hypothetical individual Daniels' age and with Daniels' education and work experience who has the RFC to perform work at the light, exertional level; no climbing of ladders, ropes, or scaffolds; frequent climbing of ramps and stairs; frequent stooping, kneeling, crouching and crawling; occasional use of the bilateral lower extremities for operation of foot controls; frequent use of the bilateral upper extremities for reaching, handling, and fingering; avoidance of all exposure to hazards, such as dangerous

---

[5] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000).  "Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  *Id.*

moving machinery and unprotected heights; avoidance of concentrated exposure to irritants, such as fumes, odors, dust and gases; limited to simple, routine, and repetitive tasks in a work environment free from fast-paced production requirements, such as moving assembly lines and conveyor belts, involving only work-related decisions with few, if any, workplace changes; no interaction with the general public; and occasional interaction with coworkers and supervisors. Tr. 57-58.  The VE indicated that the described individual would be unable to perform Daniels' past work.  Tr. 58.  However, there were unskilled jobs in the national economy that the described individual could perform, including merchandise marker, routing clerk, and sorter.  Tr. 59.  National job incidence data was provided for the identified jobs.  Tr. 59.

For the second hypothetical, the ALJ asked the VE to consider the first hypothetical with the additional limitation of a sit/stand option that would allow the individual to sit or stand, alternating positions for one or two minutes in the immediate vicinity of the workstation no more frequently than every 30 minutes.  Tr. 59.  The VE indicated that the merchandise marker and sorter positions previously identified would remain available but with a reduction in the number of jobs available in the national economy.  Tr. 59-60.  The VE explained that the routing clerk position would be eliminated but another job that would meet the hypothetical would be inspector/hand packager.  Tr. 60.

For his third hypothetical, the ALJ asked the VE to consider all the limitations in the first and second hypotheticals except at the sedentary level rather than light exertional level.  Tr. 60. The VE indicated that the following jobs would be available to the individual described in the third hypothetical: document preparer; table worker/inspector; and address clerk.  Tr. 60-61.

For his fourth hypothetical, the ALJ asked the VE to consider an individual limited to the sedentary level who would need to sit or stand, alternating positions for one to two minutes in the

immediate vicinity of the workstation, no more frequently than every 30 minutes; no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; no balancing or stooping; occasional kneeling, crouching, and crawling; limited to simple, routine and repetitive tasks; no interaction with the general public; work must be isolated from coworkers and supervisors; will consistently be allow to take two extra breaks of 15 minutes each per 8-hour work shift in addition to regularly scheduled breaks; will consistently be absent more than 5 days per month and consistently off task more than 60 percent of the work period; will occasionally be allowed to elevate the bilateral lower extremities above waist level; and is able to sit for less than 6 hours of an 8-hour workday and able to stand and/or walk in combination for less than 2 hours of an 8-hour workday.  Tr. 61-62.  The VE indicated that there were no jobs that would be available for described individual.  Tr. 62.

The VE indicated that the tolerance for being of off task was 10 percent of the work period and the tolerance for absences was one day or more per month.  Tr. 62.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[6] . . . .

---

[6] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[7] claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[8] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

---

[7] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[8] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his April 8, 2019, decision the ALJ made the following findings:[9]

1.  Daniels meets the insured status requirements of the Social Security Act through December 31, 2021.  Tr. 13.

2.  Daniels engaged in substantial gainful activity during the following periods: April 2018 through September 2018.[10]  Tr. 13-14.

3.  Although Daniels had a period of substantial gainful activity, there was a continuous 12-month period during which Daniels did not engage in substantial gainful activity – the remaining findings address the period during which Daniels did not engage in substantial gainful activity.  Tr. 14.

4.  Daniels has the following severe impairments: Lis Franc fracture of the right foot; history of left foot fracture; degenerative disc disease; depression; bipolar disorder; posttraumatic stress disorder (PTSD); and history of substance abuse (alcohol and cannabis).  Tr. 14.  Daniels had other non-severe impairments, including GERD/gastric ulcers; mild COPD/emphysema; ADHD; obstructive sleep apnea; history of cellulitis; obesity; and Crohn's disease.  Tr. 14.

5.  Daniels does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  Tr. 15-18.

6.  Daniels has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except: he must be allowed to alternate between sitting and standing positions for one or two minutes in the immediate vicinity of the workstation, no more frequently than every 30 minutes; no climbing of ladders, ropes, or scaffolds; frequent climbing of ramps and stairs; frequent stooping, kneeling, crouching and crawling; occasional use of bilateral lower extremities for operation of foot controls; and frequent use of the bilateral upper extremities for reaching, handling, and fingering; must avoid all exposure to hazards, such as dangerous moving machinery and unprotected heights; must avoid concentrated exposure to irritants such as fumes, odors, dust and gases; he is limited to simple, routine, and repetitive

---

[9] The ALJ's findings are summarized.

[10] The ALJ found that the finding regarding substantial gainful activity did not resolve the entirety of the claim.  Tr. 14.

tasks in a work environment free from fast-paced production requirements, such as moving assembly lines and conveyor belts; he is limited to making only work-related decisions in an environment with few, if any, work place changes; no interaction with the general public; and only occasional interaction with coworkers and supervisors.  Tr. 18-27.

7.    Daniels is unable to perform any past relevant work.  Tr. 27.

8.    Daniels was born in 1973 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 27.

9.    Daniels has at least a high school education and is able to communicate in English.  Tr. 27.

10.   Transferability of job skills is not material to a determination of disability. Tr. 27.

11.   Considering Daniels' age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Daniels can perform, including merchandise marker, inspector/hand packager, and sorter.  Tr. 28.

Based on the foregoing, the ALJ determined Daniels had not been under a disability, as defined in the Social Security Act, from July 15, 2017, through the date of the decision.  Tr. 28.

## V. Plaintiff's Arguments

Daniels argues that the decision is not supported by substantial evidence because the ALJ failed to include in the RFC limitations contained in opinions rendered by psychological experts – Dr. Morse and Drs. Lai and Zeune – and failed to explain why the limitations were excluded.

## VI. Law & Analysis

### A.    Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## B. Reversal and remand is not warranted

Daniels argues that "the ALJ's RFC finding is not supported by substantial evidence because it fails to include all the social limitations in the opinions which he himself found to be "persuasive", nor is the exclusion of these limitations explained." Doc. 15, p. 10. Thus, he contends that "substantial evidence does not support [the ALJ's] step 5 finding." *Id.*

Since Daniels' claim was filed after March 27, 2017, the Social Security Administration's ("SSA") new regulations for evaluation of medical opinion evidence apply to his claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence* (*Revisions to Rules*), 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

The new regulations set forth the various categories of evidence, which include (1) objective medical evidence; (2) medical opinions; (3) other medical evidence; (4) evidence from

non-medical sources; and (5) prior administrative medical findings.  20 C.F.R. § 404.1513(a)(1)-
(5).  As the regulations explain, "A prior administrative medical finding is a finding, other than
the ultimate determination about whether you are disabled, about a medical issue made by our
Federal and State agency medical and psychological consultants at a prior level of review . . . in
[claimant's] current claim based on their review of the evidence in [the claimant's] case
record[.]"  20 C.F.R. § 404.1513(a)(5).

     The new regulations provide that the SSA "will not defer or give any specific evidentiary
weight, including controlling weight, to any medical opinion(s) or prior administrative medical
finding(s), including those from [a claimant's] medical sources."  20 C.F.R. § 404.1520c(a).
Rather than the prior framework for evaluation of medical opinions that involved more weight
generally being given to opinions from treating sources, i.e., the "treating physician rule," the
new regulations provide that "administrative law judges will now evaluate the 'persuasiveness'
of medical opinions by utilizing the five factors listed in paragraphs (c)(1) through (c)(5) of the
regulation."  *Jones v. Comm'r of Soc. Sec.*, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020)
(quoting *Gower v. Saul*, 2020 WL 115169, at * 4 (W.D. Ky, March 9, 2020) (citing 20 C.F.R. §
404.1520c(a) and (b)); *see also Ryan L. F. v. Comm'r of Soc. Sec.*, 2019 WL 6468560, at *4 (D.
Or. Dec. 2, 2019) ("Although the regulations eliminate the 'physician hierarchy,' deference to
specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still
'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s]
all of the medical opinions.'") (citing 20 C.F.R. §§ 404.1520c(a) and (b) (1), 416.920c(a) and (b)
(1)) (alterations in original)).

     Further, under the new regulations, administrative law judges "will articulate how [they]
considered the medical opinions or prior administrative medical findings from that medical

source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate."  20 C.F.R. § 404.1520c(b)(1).  They "are not required to articulate how [they] considered each medical opinion or prior administrative medical finding from one medical source individually." *Id.*

The five factors are supportability, consistency, relationship with the claimant, specialization, and other factors, with supportability and consistency being the most important factors that are considered.  20 C.F.R. § 404.1520c(c)(1)-(5); 20 C.F.R. § 404.1520c(b)(2). Therefore, administrative law judges "will explain how [they] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [their] determination or decision."  20 C.F.R. § 404.1520c(b)(2).  The regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  And, the "consistency" factor is explained as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).

The regulations provide that administrative law judges "may, but are not required to, explain how [they] considered the factors in paragraphs(c)(3) through (c)(5) of this section, as appropriate, when [they] articulate how [they] consider medical opinions and prior administrative medical findings in [a claimant's] case record."[11]  20 C.F.R. § 404.152c(b)(2).

---

[11] However, where administrative law judges find that there are equally persuasive medical opinions or prior administrative medical findings about the same issue but where they are not exactly the same, administrative law

"Additionally, administrative law judges 'must consider' medical findings of non-examining state agency medical or psychological consultants according to the new regulation." *Gower*, 2020 WL 115169, at *4 (citing 20 C.F.R. § 404.1513a(b)(1)). 20 C.F.R. § 1513a(b)(1) ("Administrative law judges are not required to adopt any prior administrative medical findings, but they must consider this evidence according to §§ 404.1520b, 404.1520c, and 404.1527, as appropriate, because our Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation.").

Daniels argues that the ALJ should have adopted Dr. Morse's opinion that Daniels is "unable to respond appropriately to supervisors, co-workers, and the public in a work setting" and/or Drs. Lai and Zeune's opinion that limited Daniels to only "brief, superficial interactions in the non-public work settings" or explained why those more restrictive limitations were not included. However, Daniels has not shown that, in order for the ALJ's RFC and Step 5 finding to be found to be supported by substantial evidence, the ALJ was required to adopt the psychologists' medical opinions verbatim or explain why specific limitations in those medical opinions were rejected.

The ALJ, not a physician, is responsible for assessing a claimant's RFC. *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009). When assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding . . . [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.* And, "[e]ven where an ALJ provides 'great weight'

---

judges "will articulate how [they] considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in [a claimant's] determination or decision." 20 C.F.R. § 404.1520c(b)(3).

to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 Fed. Appx. 267, 275 (6th Cir. 2015) (unpublished); *see also Moore v. Comm'r of Soc. Sec.*, 2013 WL 6283681, * 7-8 (N.D. Ohio Dec. 4, 2013) (even though the ALJ did not incorporate into the RFC all limitations from a consultative examiner's opinion that the ALJ assigned great weight to, the ALJ's decision was not procedurally inadequate nor unsupported by substantial evidence).  Furthermore, an ALJ is not obligated to explain each limitation or restriction adopted or not adopted from a non-examining physician's opinion.  *See Smith v. Comm'r of Soc. Sec.*, 2013 WL 1150133, * 11 (N.D. Ohio Mar. 19, 2013) *affirmed*, 6th Cir. 13-3578 (Jan. 30, 2014); *see also* 20 C.F.R. § 404.1520c(b)(1) (indicating that ALJs "are not required to articulate how [they] considered each medical opinion or prior administrative medical finding from one medical source individually.").

Here, the ALJ considered Daniels' allegations regarding his mental health impairments as well as his mental health treatment history.  Tr. 18-22.  Furthermore, the ALJ applied the new regulations when considering the persuasiveness of the opinions of the non-treating psychologists, Drs. Morse, Lai, and Zeune.  Tr. 18, 23, 25-26.

The ALJ explained that he found Dr. Morse's opinion persuasive because he had the opportunity to evaluate the claimant in person and because it was consistent with mental health treatment notes and the opinions of Drs. Lai and Zeune who opined that Daniels would have moderate limitations in social functioning.  Tr. 23.   And, the ALJ explained that he found the opinions of Drs. Lai and Zeune to be persuasive because they were consistent with Firelands' counseling notes and the evaluation conducted by Dr. Morse showing a history of bipolar disorder, PTSD, depression and substance abuse that would likely cause some moderate

limitations in adaptive functioning and social interactions.  Tr. 26.  As the ALJ made clear in discussing the reasons for finding the opinions of Drs. Morse, Lai, and Zeune persuasive, he concluded that the opinions were consistent with evidence showing moderate limitations in social interactions.  Tr. 23, 26.  Taking into account moderate limitations in social interactions, the ALJ's mental RFC included a restriction that Daniels "may not have interaction with the general public, and only occasional interaction with coworkers and supervisors."  Tr. 18.  While Daniels contends that the ALJ should have included a more restrictive RFC limitation to account for Daniels' social interaction limitations, he has not shown that this RFC limitation is not supported by substantial evidence.

Additionally, "[i]n order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments. Hypothetical questions, *however*, need only incorporate those limitations which the ALJ has accepted as credible."  *Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) and *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993) (emphasis supplied)).  Thus, the ALJ was not obligated to include all of the limitations contained in the opinions rendered by Drs. Morse, Lai, and Zeune.  The ALJ was only required to include the limitations that he found credible.  While the ALJ accepted as credible that Daniels had moderate limitations in social interactions, he was not required to find that Daniels' social interaction limitations were as restrictive as Drs. Morse, Lai, and Zeune opined nor was he obligated to include those more restrictive limitations in the RFC or in hypothetical questions posed to the VE and relied upon by the ALJ.

Based on the foregoing, the Court finds that the ALJ did not err by finding the opinions of Drs. Morse, Lai and Zeune persuasive but not adopting the social interactions limitations contained therein and/or not detailing specific reasons for not including the exact social interaction limitations contained in those opinions.  Furthermore, Daniels has not shown that the RFC or Step 5 finding are unsupported by substantial evidence.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.


Dated: November 24, 2020                    /s/ Kathleen B. Burke
                                            Kathleen B. Burke
                                            United States Magistrate Judge